Exhibit D

NCJ1GRUA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MADELINE GRULLON, *et al.*,

                    Plaintiffs,

          v.                              23 Civ. 10388 (KPF)

DAVID C. BANKS, *et al.*,

                    Defendants.           Oral Argument (Remote)
------------------------------x

                                          December 19, 2023
                                          2:04 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge

                              APPEARANCES

BRAIN INJURY RIGHTS GROUP, LTD.
     Attorneys for Plaintiffs
BY:  RORY J. BELLANTONI, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
     Attorneys for Defendants
BY:  JAIMINI A. VYAS, ESQ., Assistant Corporation Counsel
     THOMAS LINDEMAN, ESQ., Assistant Corporation Counsel
     JASON IMBIANO, ESQ., Assistant Corporation Counsel

ALSO PRESENT:  HANNA GIUNTINI, ESQ.
               New York City Department of Education

NCJ1GRUA

1          (Case called)

2          THE LAW CLERK:  Counsel, please state your names for

3      the record, beginning with counsel for the plaintiff.

4          MR. BELLANTONI:  Good afternoon, your Honor.  Rory,

5      R-O-R-Y, Bellantoni, B-E-L-L-A-N-T-O-N-I, for the plaintiff.

6          THE COURT:  Sir, good afternoon, and thank you very

7      much.

8          Representing the defendants this afternoon?

9          MR. VYAS:  Good afternoon, your Honor.  This is

10     Jaimini Vyas for the defendants.  I'm joined by Mr. Thomas

11     Lindeman in my office and by Mr. Jason Imbiano over the

12     telephone.

13         THE COURT:  Okay.  Thank you to all of you for

14     participating.  We do have a court reporter on the line, so I

15     am going to ask you please to be mindful of that and to just

16     answer questions when you're directed to, and if you haven't

17     identified yourself and it's not obvious from my question who

18     you are, if you could just identify yourself.

19         Mr. Vyas, I'm going to begin with you, sir.  In

20     preparation for this proceeding, at about noon today, I

21     received a letter from you regarding the four cases that are I

22     believe at issue in this litigation.  I'm wondering if you

23     could explain to me the difference between authorizing or

24     making payments on a priority basis and making payments on an

25     ordinary-course-of-business basis.  And what I mean by that,

NCJ1GRUA

1   sir, is:  What are the different processes, if there are any,

2   that you have to go through, and what is the anticipated

3   schedule for payment?

4           MR. VYAS:  Your Honor, my understanding is that this

5   payment, the DOE trying to process this payment as a priority.

6   That means that they have put every other payment on hold.

7   They put the processing of other payments, the reviewing of

8   documents in other cases on hold, and essentially, you know,

9   this has been put on the top of the pile to be paid out.  They

10  were trying to issue the payment immediately yesterday, but I

11  was informed that it might take a few days; it might not happen

12  within 24 hours.

13          THE COURT:  How will you know, sir, when that payment

14  has been authorized?

15          MR. VYAS:  Your Honor, our liaison at the DOE would

16  email us and inform us that that payment has been issued.

17          THE COURT:  I see.  And so the liaison is constantly

18  working with your office to let you know when payments are

19  issued in contested cases?

20          MR. VYAS:  No, your Honor, but in this case——

21          THE COURT:  Excuse me.  Okay.  Go ahead, please.

22          MR. VYAS:  I apologize, your Honor.  So yes, for each

23  case the liaison is constantly in contact with our office, not

24  for every student but for cases filed in court; and similarly,

25  for this case, once the payment is authorized or is issued, the

NCJ1GRUA

1    liaison for this case would email us and inform us that it has

2    been done.

3         THE COURT:  Your answer actually anticipates a

4    question of mine.  Is there a time delay between authorization

5    and issuance, and if so, is there a typical length of time

6    between authorization and issuance in priority cases?

7         MR. VYAS:  Your Honor, I am actually deferring to

8    Mr. Lindeman on this question.

9         THE COURT:  Okay.  That's fine.  And Mr. Lindeman is

10   of course welcome.  Because, sir, you just said to me a moment

11   ago—and this is why I ask—that the liaison at DOE would

12   advise you of the authorization or issuance, which suggested

13   that those are two different events.

14        Mr. Lindeman, may I have any insight you may have on

15   this issue, sir.

16        MR. LINDEMAN:  Yes, your Honor.  This is Thomas

17   Lindeman.

18        I think the simplest answer is the authorization is

19   the process by which DOE reviews documents to determine that

20   they are accurate and that they correctly, you know, identify a

21   payment that should be reimbursed.  The relevant consideration

22   here is the IHO order, what it orders to be reimbursed, what

23   documentation it requires, and what document has been

24   received—usually, in the case of tuition, which is at issue

25   here, a tuition affidavit of some variety from the school, as

NCJ1GRUA

| | |
|---|---|
| 1 | well as the agreements entered into by the parents to pay the |
| 2 | school whatever the amount is.  If all of those documents |
| 3 | align, then the payment is authorized, at which point it is put |
| 4 | through, you know, a traditional processing and simple |
| 5 | bureaucratic monetary processing, that eventually results in a |
| 6 | check being issued or an electronic transfer being conducted. |
| 7 | Those things obviously are somewhat out of the control of the |
| 8 | Department of Education and more left to the banks at that |
| 9 | point, but—so as far as priority, when the DOE prioritizes |
| 10 | something, simply that just means that they are, yeah, as the |
| 11 | city has said, putting other work on hold to make sure that |
| 12 | these payments are approved and that these payments are, you |
| 13 | know, shepherded through the process by which a check is |
| 14 | eventually signed and issued.  At that point we usually say |
| 15 | that once something has been authorized, it takes 14 days at |
| 16 | the outside to end up in iBRAIN's bank account.  When those |
| 17 | things are being expedited, the goal is to get those done in a |
| 18 | few days or a week.  But that's the loose process. |
| 19 |         THE COURT:  Just one moment, please, sir.  Thank you. |
| 20 |         Mr. Lindeman, in your answer to me, you mentioned that |
| 21 | having something designated as priority means that other work |
| 22 | is put on hold in order to make sure that the payment is |
| 23 | approved, or that the request is shepherded through the |
| 24 | process.  That would suggest to me, sir, that if something is |
| 25 | in a priority mode, if there were any problems, someone at DOE |

NCJ1GRUA

1    perhaps would reach out to someone in your office to coordinate

2    with getting necessary information from plaintiff's counsel?

3    Do I understand that correctly?

4          MR. LINDEMAN:  That is often the case.  The

5    implementation unit will also reach out directly to either the

6    provider or plaintiff's counsel in certain circumstances,

7    depending on sort of the posture of the payment and of the

8    case, but we will often, you know, pursue multiple angles to

9    attempt to achieve the same goal.

10         THE COURT:  Okay.  To the best of your collective

11   knowledge, is there today documentation that is outstanding and

12   that is a necessary precondition to reimbursement of tuition in

13   this case?

14         MR. LINDEMAN:  Of tuition, your Honor?

15         THE COURT:  Tuition, yes.  I know.  Transportation and

16   nursing we'll talk about in just a second.  Thank you.

17         MR. LINDEMAN:  Yes, your Honor.  As I understand it, I

18   do not believe——I have not been made aware of and I have no

19   reason to believe at this time that there is any outstanding

20   documentation relating to tuition.

21         THE COURT:  Okay.  Then you've anticipated my next

22   question, sir, which is with respect to transportation and

23   nursing.  I know for the student S.J.D., there was a request on

24   or about December 18th, which is only yesterday, but to the

25   best of your collective understanding, are there outstanding

NCJ1GRUA

1   requests or is there a need for documentation for

2   transportation or nursing for anyone else?

3           MR. LINDEMAN:  I believe there is also an outstanding

4   request for—I'm sorry.  I believe that there was an

5   outstanding request for a further student.  I'm trying to

6   remember.  Looking through my notes.  It might have been R.P.

7   I am trying to confirm that.  The others, I don't believe so.

8   The other outstanding payments are mostly related to, you know,

9   the timing of the recent or more recent findings of fact and

10  decisions and the fact that there are, beyond these four

11  students and the other 50 or 60-odd students at iBRAIN, an

12  additional 15- to 20,000 new process complaints and attendance

13  pendency and final orders being worked on by the implementation

14  unit at this time.  Those amounts will be paid or, you know, or

15  further documentation will be requested as they come up, but at

16  this time those are the only ones that I'm aware of.

17          THE COURT:  Okay.  And Mr. Lindeman, if you need to

18  pass the baton as I ask you this question, you'll certainly do

19  so to Mr. Vyas.

20          With respect, for example, to R.P., there's been

21  indication that there was a payment of $149,348.02, in full

22  satisfaction of the amount owed towards tuition.  Is that for

23  the period of time that ends December 31st?  Is that for the

24  school year?  Is that for something else?  I'm just trying to

25  figure out, when payments are being made, whether something

NCJ1GRUA

 1   else is left.

 2              MR. LINDEMAN:  Yes, your Honor.  Under the——the amount

 3   for R.P. was for——from 7/5/23 through the end of this calendar

 4   year.  I think——I believe that was also the case for the

 5   payment made for L.S. under pendency, though obviously L.S.

 6   received a final order that raises that amount and the

 7   implementation unit is working on reviewing that documentation

 8   and approving those further payments.  But the way that

 9   pendency obligations are met is through the end of the year and

10   then on January 1st through the end of the school, the extended

11   school year.

12              THE COURT:  All right.  Thank you.

13              Mr. Bellantoni, I appreciate your patience, sir.

14   Mr. Bellantoni, have you reviewed the letter that was sent to

15   me at or about noon today?

16              MR. BELLANTONI:  I have had a chance, your Honor, to

17   review it on my phone in the car, but yes, I have reviewed it.

18              THE COURT:  Okay.  Reviewed on the phone in the car.

19   Were you able to see it all, sir?  I'm not always able to do

20   so.  That's why I'm asking.

21              MR. BELLANTONI:  I was, Judge.  I think I was.  If I

22   missed something, I'm sure somebody will let me know, but I was

23   able to review it, yes.

24              THE COURT:  Sir, with respect to each of the students,

25   there is an explanation given regarding what has happened and

NCJ1GRUA

where we are in the process.  Is there anything about the

narratives that have been communicated to me about each of

these four students with which you or your clients disagree?

MR. BELLANTONI:  If I may, your Honor.  First, let me

just say——

THE COURT:  You may.

MR. BELLANTONI:  ——the letter does not explain why

pendency was not paid prior to us filing this complaint for any

of the students.  I know there was a payment for L.S. that was

after this lawsuit was filed.  So the suit was filed on

November 27th.  Nor does it say when payments will be paid

other than the standard language, "in due course."

Having said that, let me just address each student

briefly.  C.B., there was——

THE COURT:  Please pause, sir.  Thank you.  I know you

were participating in this call.  This is precisely why I asked

the question of Mr. Vyas and Mr. Lindeman about what being on a

priority was.  So as a result of their answers to me, I think I

have a better sense of the time frame.  Do you also have a

better sense of the time frame within which authorizations

and/or payments are contemplated?

MR. BELLANTONI:  I do not, Judge, because of the

following.  We were on the phone on Friday.  They processed a

$190,000 payment for L.S.  That was made this morning, from

what I understand, is in the portal showing it will be

NCJ1GRUA

| | |
|---|---|
| 1 | disbursed tomorrow.  With respect to tuition, the other |
| 2 | students still have uncontested tuition payments, yet nothing |
| 3 | went into the payment information portal that the school has |
| 4 | access to——I don't——that would indicate these payments were |
| 5 | approved, being processed, and/or will be disbursed. |
| 6 | Oftentimes—— |
| 7 | THE COURT:  No, no.  Mr. Bellantoni, Mr. Bellantoni, |
| 8 | let's try that again. |
| 9 | I'm going to skip around a little bit. |
| 10 | With respect to the fourth student, initials R.P., do |
| 11 | you agree that tuition has been paid in full? |
| 12 | MR. BELLANTONI:  For R.P.?  Yes, for the first half of |
| 13 | the school year. |
| 14 | THE COURT:  Yes, sir. |
| 15 | All right.  So with respect to L.S., you understand |
| 16 | from your clients that there's $190,000 in the portal for |
| 17 | tomorrow, correct, sir? |
| 18 | MR. BELLANTONI:  That is correct, your Honor, but—— |
| 19 | THE COURT:  Okay. |
| 20 | MR. BELLANTONI:  ——there have been—— |
| 21 | THE COURT:  No, no.  With respect to C.B.  I |
| 22 | understand there are no payments for either of those students |
| 23 | just yet, that they are reviewing those materials.  So now you |
| 24 | can talk to me about why and to what extent you are still |
| 25 | pursuing a TRO. |

NCJ1GRUA

1          MR. BELLANTONI:  So, your Honor, for C.B., I believe

2     the letter indicates that there was an appeal and that payment

3     was restarting on November 29th, and that it would be processed

4     in the ordinary course.  I still don't know what that means.

5     They've been in the process since November 29th.  All

6     documentation has been sent several times.  I'm not sure why

7     it's now 20 days and there's not even indication that payment

8     will be disbursed in a week or two weeks or whenever it is.

9          For the other student we're talking about, S.J.D.,

10    although there's an indication tuition is a priority, I believe

11    the letter also talks about an FOFD from November 17th.  I

12    don't know where in the ordinary course——so they talk about as

13    a priority but will be disbursed in the ordinary course.  I

14    don't know which one that is.

15         THE COURT:  Sir, sir, sir——

16         MR. BELLANTONI:  And I also made——

17         THE COURT:  Sir.  Thank you.  Please don't talk over

18    me.

19         With respect to S.J.D., they say they're working to

20    authorize the tuition as a priority and the transportation and

21    nursing in the ordinary course of business.

22         MR. BELLANTONI:  Okay.  I apologize.  I didn't have

23    that in front of me right now.  But if I can address——

24         THE COURT:  I see.  Go ahead.

25         MR. BELLANTONI:  I don't know if I can move to the

NCJ1GRUA

1    transportation at this point, your Honor.  There was a

2    representation that documents were requested yesterday.  I'm

3    not saying they weren't, but I wasn't copied on that email,

4    number one; number two, the DOE is taking a position I suppose

5    now that there are documents in this case that need to show

6    when the student actually took the bus, and that is not what

7    the FOFD says.  The FOFD provides that transportation shall be

8    funded in an amount of $111,180.  That's a set amount

9    consistent with the transportation agreement that provides

10   transportation for the number of public school days in a school

11   year whether or not there's actually a ride taken.  So this is

12   a case, like R.P.——R.P.'s transportation agreement as part of

13   pendency specifically says——or the order, I should say, the

14   pendency order——that transportation shall be funded pursuant to

15   the agreement in a total amount for 219 days in a school year,

16   177,390.  That's from the 22-23 school year, but forms the

17   basis of pendency for this year.

18        So I have some sense that the DOE is working towards

19   payment.  Again, as far as when that will be, as far as what

20   the emergency is, as far as the tuition goes, my

21   understanding——and I've only had this information, obviously, a

22   short time, but the school took a bridge loan, was able to

23   secure a bridge loan that comes due this week——not sure if it's

24   tomorrow or the next day——that did cover the payroll for

25   Friday, but that loan requires that it be paid back, as I said,

NCJ1GRUA

1    tomorrow or the next day.  So there still is an urgency.  I

2    don't know if other monies have come in since Friday on other

3    cases that somewhat mitigate that urgency, but from what I

4    understand, your Honor, there still is the urgency because this

5    loan has to be paid back and this money would be used to pay

6    the school's expenses and/or secure another bridge loan, given

7    that the lender has some certainty that money would be payable

8    within a certain time frame.

9              THE COURT:  Mr. Bellantoni, are the nursing and

10   transportation expenses paid by iBRAIN and then reimbursed to

11   iBRAIN or are the nursing and transportation expenses paid by

12   DOE directly to the service providers?

13             MR. BELLANTONI:  They're paid by DOE directly to the

14   service providers.

15             THE COURT:  Okay.  So do I understand, therefore, that

16   deficiencies with respect to nursing and transportation would

17   not cause your client to be unable to meet its payroll?

18             MR. BELLANTONI:  Well, my—again, I don't represent

19   iBRAIN.  It would interfere—the deficiencies, if the services

20   are suspended, will result in my clients not being able to

21   access—in the case of transportation, given that they're

22   wheelchair bound and require special vans, would not be able to

23   access the school; and nursing is something that they get on a

24   1:1 basis in school because many of the students have G-tubes

25   or other issues with breathing and/or swallowing that require a

NCJ1GRUA

1    1:1 nurse with them all day long.  From what I understand,

2    though, however—

3            THE COURT:  Mr. Bellantoni, no one is disputing that.

4    Mr. Bellantoni, your irreparable harm argument to me and the

5    basis for your TRO was that the failure of DOE to make payments

6    for tuition to iBRAIN was causing iBRAIN to teeter on the brink

7    of insolvency and to possibly shut down.  So I don't believe

8    you've yet told me that there is a bus company that says, we

9    will not pick up these four children this week, or ever, nor do

10   I believe you've told me that there is a nursing outfit that

11   has said, we will not be there for R.P. or L.S.  Do you have

12   evidence that one of the transportation providers or that one

13   of the nursing providers has said that they will cut off

14   services for a student as of a particular day?

15           MR. BELLANTONI:  Your Honor, I do apologize because

16   these cases are bleeding together, but there are students who

17   have received letters from transportation and nursing—I

18   believe in this case transportation.  I don't have the

19   complaint, unfortunately.  But yes, there were similar letters

20   that the transportation company, if they didn't receive payment

21   within a certain time frame, might not be able to provide

22   transportation.  Nursing as well.

23           To answer your other question—and I apologize I

24   didn't do this, but—nonpayment to nursing provider or

25   transportation will not affect iBRAIN's ability to operate.  I

NCJ1GRUA

1    believe that was the question, and that is the answer, Judge.

2            THE COURT:  And that is the concern that I have.  Once

3    again, I appreciate that your clients wish to be paid, and I

4    appreciate that they wish to be paid in a timely fashion, and

5    actually, you're going to tell me again that your clients are

6    the parents, but really—well, you're going to keep telling me

7    that, sir, but your motion speaks in terms of the precarious

8    financial condition of iBRAIN and not the precarious financial

9    condition of any of the parents here.  We are here for a TRO,

10   and whether or not there is a likelihood of success on the

11   merits, and I'm still evaluating that.  One of the things that

12   you led with in your papers is the idea of irreparable harm,

13   and the irreparable harm was that these children were not going

14   to get any education because the school was going to close

15   down.  So if the tuition payments are being made, then I don't

16   think you have that irreparable harm argument.  And to the

17   extent what you're saying to me is that you don't know what

18   priority means, I don't know that it would be appropriate for

19   me, for example, to force DOE to cut a check or to make an

20   electronic funds transfer today or tomorrow.  That may be what

21   you're ultimately asking for.  But I guess I'll hear from you

22   more on that point, sir.

23           MR. BELLANTONI:  Your Honor, I'm asking for, if not

24   the immediacy—my understanding again from the school is it

25   would be easier or they would be able to get the financing they

NCJ1GRUA

1    need if there were an ordinary course.  So if it's not an order

2    by tomorrow, by Friday, by next Monday, something the DOE would

3    have to comply with that would inject some certainty for the

4    parents in this case to know that these students will not be

5    displaced by the lack of funding.

6            As far as the TRO, I'm approaching it from a little

7    bit different standard.  In *Mendez*, the Second Circuit talked

8    about the 1415(j) automatic injunction, and although they said

9    it's not automatic when it comes to payments for private school

10   placement, the parents may be able to request that automatic

11   injunction, that injunction under 1415(j) when placement is in

12   jeopardy because of a delay or nonpayment.  So even consistent

13   with the DOE's course, pendency is usually and typically not

14   paid this late for the first half of the school year.  My

15   understanding from the school, this has placed them in

16   jeopardy.  In jeopardy of——they have already missed one

17   payroll, November 15th, and they're trying to keep this payroll

18   up.  The reason it sounds like I'm representing the school is

19   because the school doesn't single out these students, and if

20   the school closes, then none of my clients have their

21   educational placement, one that was ordered by the

22   administrative officers for last year.  So I know that the TRO

23   and the preliminary injunction standard——I know what they

24   require, but this motion or this request is——also considers

25   what the Second Circuit said in *Mendez*, and even though they

NCJ1GRUA

1    didn't talk about irreparable harms, they talked about a

2    likelihood of jeopardy or being at risk in the placement.

3    Almost presumes that if——

4            THE COURT:  But sir, what are the component——I hear

5    you, and I too have read *Mendez*.  Thank you very much.  But

6    what are you suggesting?  I mean, the tuition payments are, as

7    I understand it, they're on their way to being paid on a

8    priority basis.  That leaves you with transportation and

9    nursing services.  Are you suggesting that the record in this

10   case is such that I can make a finding under what was left open

11   in *Mendez* based on the transportation and the nursing services?

12           MR. BELLANTONI:  Your Honor, again——and I apologize.

13   If the letters that I were discussing were exhibits to this

14   complaint, I would say yes.  I would say that it would be

15   obviously within your discretion to decide how quickly those

16   payments would be made.  If those letters are not in this

17   complaint, then the urgency has not been set out the way it has

18   been for the tuition, your Honor.

19           THE COURT:  Okay.  Sir, I'm just trying to find the

20   letters of which you speak, so one moment, please.

21           MR. LINDEMAN:  Your Honor, this is Thomas Lindeman.

22   Could I briefly——they're actually exhibits 1-7 and 1-8 to the

23   complaint, but——1-7 and 1-8 on the docket.  But I actually

24   have——

25           THE COURT:  Yes, I'm——

NCJ1GRUA

1        MR. LINDEMAN:  ──something to say about these letters,

2   briefly.

3        THE COURT:  One moment, sir, because I'm trying to get

4   to these letters.  Excuse me.

5        I'm at 1-7 right now.  May I ask again, was that

6   Mr. Lindeman or someone else?

7        MR. LINDEMAN:  Yes, your Honor.

8        THE COURT:  Thank you, Mr. Lindeman.  I'm looking at

9   1-7 right now, which is from B&H Healthcare Services.  Yes.

10       MR. LINDEMAN:  Yes.  Both of these documents, document

11  1-7 and document 1-8, are from B&H Healthcare Services, Inc.,

12  d/b/a Park Avenue Home Care.  They are both from November 28,

13  2023.  One of them purports to be addressed to Ms. Maria

14  Hidalgo; the second one purports to be addressed to Mr. Patrick

15  Donohue.  My concern, your Honor, these documents are──certain

16  elements of the information of them have been blacked out, it

17  appears──again, obviously to protect the identity of the

18  students.  That's perfectly fine.  But the last paragraph of

19  both letters says, "Unfortunately, we must require these

20  balances to be paid within 30 days or may no longer be able to

21  provide Sebastian with nursing services."  Now──

22       THE COURT:  And Sebastian is none of the children in

23  this case?

24       MR. LINDEMAN:  That's correct, your Honor.  Now I am

25  aware that there is also the issue that Mr. Donohue's letter is

NCJ1GRUA

addressed, "Dear Ms. Revis."  So I don't know which plaintiff

that is.  But the reality is, these letters do not have much

credibility, in my mind.  Again, these payments are being

processed, no one is trying to prevent B&H Healthcare Services,

Inc., d/b/a Park Avenue Home Care, from receiving the amounts

that they are entitled to under these IHO orders.  But I do not

believe that these letters are credible in any way.

THE COURT:  All right.  Mr. Lindeman, I'm not agreeing

or disagreeing with you at this point.  Let me ask a slightly

different question, which is:  The IHO case numbers that are

listed on each of these two letters, are they correct?

MR. LINDEMAN:  The S.J.D. number appears to be

correct.

Yes, the IHO case numbers may be correct, though I

don't know if the amount outstanding is correct.  I don't have

that in front of me.  I believe that the case numbers match the

address—plaintiffs at the top, though again, the fact that one

letter appears to be sent to Mr. Donohue but addresses

Ms. Revis and speaks to the services to a student who is

uninvolved in this case may call some of that into question.

Nevertheless, Mr. Donohue's case number seems to correlate with

the student.

THE COURT:  Mr. Lindeman, a separate question for you.

According to Mr. Bellantoni, there is no need for the

substantiation that your client is seeking because at least in

NCJ1GRUA

one case, the FOFD sets the amount.  In fact, I think in two

cases, the FOFD sets the amount.  So there's no checking to be

done, says Mr. Bellantoni.

        MR. LINDEMAN:  In the case of C.B. and in the case of

R.P., I believe, we have——as we stated here, those documents

are being reviewed and processed, at least in terms of——I mean,

I do not believe we're disagreeing about any further

documentation related to specifically nursing.  The only

documentation that we're disagreeing about is transportation.

        In the L.S. case, I think it says not to exceed an

amount, and it also has the language of to and from the

child——from the child's home to the school, which, in certain

cases, including the *Davis* matter which Judge Furman decided

earlier this year, the court has acknowledged has to mean

something, and what that has been taken to mean, at least by

the Department of Education and by certain judges and IHOs, is

that amount is supposed to be the upper limits of an amount

that would be reached if the student went to school every

single day.  Again, obviously the details and the specific

language of these orders is not necessarily what we are here to

debate, and if proper documentation has been provided, these

payments will be made.  But——

        THE COURT:  So Mr. Lindeman, when you speak about C.B.

and R.P. and you say that with respect to nursing, your client

has all the documents it needs, I don't know what "ordinary

NCJ1GRUA

1   course of business" is, and Mr. Bellantoni, understandably, is

2   noting that we've gone, you know, 20 days, several weeks, and

3   nothing's been paid.  And I understand he was at that point

4   speaking about a tuition issue.  But I don't know what

5   "ordinary course of business" is.  You sort of suggested to me

6   that priority can be two weeks but you try and get it done

7   within a week.  What is "ordinary course of business"?  Is it a

8   month?

9        MR. LINDEMAN:  "Ordinary course of business" is—in

10   terms of the time line, "ordinary course of business" is simply

11   how long it takes the Department of Education to review every

12   single, you know, impartial administrative order that comes in

13   as well as the attendant documents provided by plaintiff.  I

14   don't have directly in front of me the dates that documentation

15   was provided for these things.  And I'm not a hundred percent

16   certain—previously, in prior years, the way that plaintiff

17   provided documentation for nursing and for transportation was

18   monthly.  We received an affidavit at the beginning of the year

19   that detailed supposedly how much nursing and/or transportation

20   costs would be for the entire year, and then at the end of

21   every month, we would receive an invoice for that month

22   detailing what services were used for that month.  And

23   occasionally we would come in, you know, run into an issue at

24   the end of the year when certain, you know, amounts would—some

25   invoices would come in all at once, and the eventual total

NCJ1GRUA

1    amounts of the invoices for the extended 12-month school year

2    would not line up with the affidavit that we'd been provided at

3    the beginning, and we'd request documentation to be corrected,

4    to make sure those numbers line up, that the amounts were

5    actually sent, that the student actually received those

6    services.

7            But in this case, I know——in this school year, I know

8    that the transportation company has moved to some sort of

9    three-times-a-year installment plan, so I believe that we

10   received documentation for these students who we are not

11   seeking attendance records for, which is, again, a bit of a

12   different can of worms because iBRAIN apparently doesn't keep

13   tuition records, which is a different issue, but we I believe

14   received the first two but not the last installment——invoices.

15   Those are being processed and reviewed.

16           But also, there are only so many people that work at

17   IU.  They are working on every single one of these impartial

18   hearing officer decisions that we receive, not just iBRAIN

19   students.  These are also the students going to Gersh and

20   Manhattan Child Center and Reach for the Stars and, you know,

21   any number of other state-approved and nonstate-approved

22   private schools, all of whom need services and are entitled to

23   reimbursement.  So the ordinary course is simply those people

24   who have schedules and they have——and they are working very

25   hard but they also need to eat and sleep sometimes.

NCJ1GRUA

1          THE COURT:  Well, Mr. Lindeman, just following on the

2     last point that you're making——not the eating and sleeping

3     point, sir, but I guess the point before that——

4          MR. LINDEMAN:  Sure.

5          THE COURT:  ——earlier it was suggested to me by you

6     and your colleague that taking something as a priority meant

7     basically moving it to the top of a pile.  I'm sensing from the

8     answer you just gave me that that pile is quite a large one and

9     that your position would be——and I might disagree with it, but

10    I want to hear it——that there's only so many things that I can

11    order your client to move to the top of the pile because every

12    time I did that, I would be displacing some other equally

13    worthy school from getting its bills paid.  Do I understand

14    that to be your argument?

15         MR. LINDEMAN:  Your Honor, I think that is a real

16    concern that we have.  Last week we discussed——you'd brought

17    up, you know, the *L.V.* decision that issued earlier this year.

18    And I assume your Honor is aware and interested in what's going

19    on with that.  The special master released his impartial report

20    a few weeks ago for the first one——maybe a little longer than a

21    few weeks ago, but not——but relatively recently, and he speaks

22    very highly in that report of the implementation unit and their

23    efforts to improve these processes and get payments made faster

24    and to meet the obligations laid out by Judge Preska earlier

25    this year.  But he also notes that the implementation unit is

NCJ1GRUA

1    beset by competing priorities from multiple sides.  Every time

2    we get one of these preliminary injunction matters from

3    plaintiff's counsel and every time we, you know, receive an

4    order to move something to the top, that's another competing

5    priority.  All of these students matter.  All of these students

6    are entitled to services and entitled to these payments.  No

7    one is contesting any of that.  But this is the at least

8    seventh preliminary injunction that plaintiff's counsel has

9    brought, and this motion plaintiff's counsel has brought this

10   year related to payments.  We had an additional six or seven

11   that were specifically seeking pendency determinations, and we

12   had a few that were for an individual student that has morphed

13   into SRO appeals that we're also dealing with.  It is

14   overwhelming, the amount of pressure that has been placed on

15   both the Department of Education and, bluntly, this office, the

16   law department, by these cases.  Even if we all wanted——we all

17   want all of these to be at the top of the pile.  But

18   someone——but if that happens and then, you know, in the *DeJesus*

19   *Rodriguez* case, which I know your Honor is set to receive

20   papers on later this week, if that goes on the top of the pile,

21   will this case now be right below that on the pile?

22        THE COURT:  All right.  Mr. Bellantoni, sir, thank you

23   very much.  I'll hear from you now.

24        MR. BELLANTONI:  Your Honor, the problem is there is

25   communication between the DOE and our office, the law

NCJ1GRUA

1   department and our office, and attempts to resolve these cases.

2   Every time we've filed an action, we have discussed with the

3   law department that we're going to file it if we don't get some

4   indication, just what is the due course, where are we in the

5   pile.  I get there's a pile, but these children are in the pile

6   too.  And I can't help but, again, recognize that payments for

7   the kids in all these cases we brought, none of them were

8   made——let me qualify that.  There may be some, but the vast

9   majority——30 out of 32 or 33——were not made until we bring an

10  action.  We're not told that it will be another month; we're

11  not told where in the pile we are.  We send documentation——we

12  sent documentation in August, then again in October, then again

13  there was a demand yesterday.  We provide documentation as soon

14  as we can; the school does; the other folks do when they can.

15  Then we get in these situations like S.J.D., where the FOFD

16  clearly rejects the per diem payment basis and says, pay us

17  total amount of $111,000 for transportation, and that means the

18  219 school days in the public school year.  I've conceded where

19  the orders say paid for only rides used or only rides provided,

20  and trying to, with my client in those cases, get documentation

21  together to provide it to the DOE.  No judge has yet said "to

22  and from" means specifically you should only pay for rides

23  actually used.  Judge Furman and Judge Cronan remanded the

24  matters to the IHOs.  The IHOs that have limited payment for

25  transportation to rides used have been overruled by the state

NCJ1GRUA

1    review officers in the Department of Education.  Officers⸺it's

2    either Crowak (ph) or Bates and SRO Harrington have both

3    rejected this per diem payment.  It doesn't go on for

4    education.  They paid for the tuition.  If they deprived my

5    clients of a FAPE, they paid for tuition, what the cost is.

6    The excessiveness of tuition is litigated at the administrative

7    level.  I get there's a certain amount of checking to be done,

8    but what's being lost here⸺and perhaps because I'm not

9    articulating it the correct way⸺is that these cases are vetted

10   by the administrative offices.  If they felt that tuition was

11   excessive, they would say so.  Or they have, for whatever

12   reason, said rides should be actually provided.  If we don't

13   appeal that order, Judge Schofield in one case said that's the

14   order we're stuck with.  So you have to show that the child

15   attended school.  None of these cases are that.  The FOFDs.

16            THE COURT:  Okay.  But Mr. Bellantoni, I just have to

17   stop you for a moment.  The reason I'm not focused on

18   transportation right now⸺although I appreciate everything

19   you've just said to me⸺that doesn't sound like that's the big

20   issue in this case.  So you've given me nothing to suggest⸺at

21   least I'm not seeing anything that suggests⸺that a child is

22   not going to get transportation because they haven't paid the

23   transportation.  What I'm seeing right now, sir, is I see two

24   rather suspect letters from B&H Healthcare Services, which is

25   about the nursing.  I've just been told by Mr. Lindeman that

NCJ1GRUA

1    there are amounts that they believe they have all the paperwork

2    for, so I see those.  But if we're talking about

3    transportation, I don't think I have a record to issue a TRO

4    based on the failure to pay transportation costs.  Tell me if

5    there's something here I should be looking at.  But I just

6    don't see it here.

7              MR. BELLANTONI:  There is nothing more than we

8    discussed, your Honor.  That's correct.  I can only work with

9    what is and that is what is.  The bigger problem here has been

10   the tuition.

11             THE COURT:  Yes, sir.

12             MR. BELLANTONI:  Well, I——I'm sorry.  I didn't want to

13   speak over you, Judge.

14             THE COURT:  No, no.

15             MR. BELLANTONI:  And the declaration that I've gotten

16   from Mr. Mielnik is obviously much more detailed than anything

17   that we submitted from the other two providers.  I would just

18   also note, Mr. Mielnik was——

19             THE COURT:  I'm sorry.  Mr. Bellantoni, I'm so sorry.

20   You cut out for a moment, sir, when you were talking about the

21   declaration.  I'm sorry.  I missed everything that you said

22   about it.

23             MR. BELLANTONI:  Simply saying, your Honor, the

24   declaration does create that urgency.  It is the focus of this

25   motion.  More than the other two areas.  I'm agreeing with the

NCJ1GRUA

1    Court.  So yes, that would be the answer to your question,

2    Judge.

3            THE COURT:  Okay.  Thank you.  One moment, please.

4            All right.  Thank you.  Mr. Bellantoni, was there

5    something else you wanted to say in reply to all of the

6    information I received from Mr. Lindeman?

7            MR. BELLANTONI:  Judge, only that a lot of the

8    discussion about paperwork, consistent with your statement a

9    moment ago, there's also transportation and nursing.  Very

10   rarely, if ever, is the tuition called into question.  There

11   are affidavits.  There are contracts.  There are no limitations

12   with transportation.  So again, from my perspective, there is

13   no reason why it takes us filing a lawsuit to get the DOE

14   moving on that issue.  I can accept that we're in the pile, but

15   there's never any discussion as to where we are in the pile,

16   and the special master's last report is not as flattering as

17   counsel indicates, still talks about the delays and the

18   unacceptable delays in payment that leaves parents——parents

19   like the parents here——questioning and not knowing what the

20   state of, you know, their child's placement is going to be from

21   month to month, or at least from one semester to the next.  So

22   it is a problem.  And I would prefer not to be here arguing

23   this motion, Judge, if I didn't have to be.  It's not like I

24   run to court for no reason.  We have no payments made until the

25   lawsuits are initiated.  That's the DOE's track record.  And if

NCJ1GRUA

1    it changes, I won't bring these lawsuits.  But if it doesn't,

2    I'm not sure what I'm supposed to do as an advocate for the

3    children.

4            Thank you, Judge.

5            THE COURT:  One moment, please.

6            Mr. Bellantoni, do you represent students at schools

7    other than iBRAIN?

8            MR. BELLANTONI:  We do represent some of the students

9    at some points in time when they go back to iHope.  Sometimes

10   they get separate counsel after they go back, sometimes they

11   stay with us for a while.  We represent students in other

12   states, so obviously they're not in iBRAIN.  Florida,

13   Connecticut.  We've started actions in California.  So there

14   are students at other schools, and if students came to us from

15   other schools, we would represent them as well, yes, Judge.

16           THE COURT:  Let me explain why I'm asking the

17   question, sir.  Several years ago your perhaps former colleague

18   Mr. Ashanti brought a whole bunch of cases as a result of the

19   iHope-iBRAIN schism, and they were predicated on what

20   ultimately was a flawed view of pendency, and we dealt with

21   them, and I had four or five of them myself.  And now I have

22   several more requests for emergent relief coming from iBRAIN,

23   and I'm just trying to figure out whether there's any other

24   school that has such rotten luck in dealing with DOE, because,

25   for example, the Gersh school that was mentioned by

NCJ1GRUA

1    Mr. Lindeman, I have nothing from them.  I've never gotten

2    anything from them.  The Manhattan center that I'm not even

3    remembering the full name of to which you referred, I have

4    nothing from them either.  So, I mean, when I'm getting cases

5    with TROs, it's frequently iBRAIN, and I'm just trying to

6    figure out, what is it about the relationship between that

7    school and DOE that has resulted in so much litigation.  And

8    you were hinting at it earlier, I suppose, when you said that

9    you feel that——or the school feels that DOE doesn't listen to

10   you unless you file a lawsuit.  But I'm concerned if I'm going

11   to have this from every other school providing these services.

12   So do you have any other thoughts as to what it is about iBRAIN

13   that is yielding or results in these lawsuits?

14           MR. BELLANTONI:  Judge, I can only say that my

15   experience started in 2018 when I joined iBRAIN.  I didn't have

16   much, if any, educational experience before that, especially in

17   New York City.  So I deal closely with iBRAIN, and I——Judge, I

18   don't have——any theory I have, I'm not sure folks would agree

19   with.  To me, there obviously seems to be some bad blood

20   between these two.  Again, I'm not bringing lawsuits where

21   pendency has been paid.  I understood *Ventura de Paulino*, and

22   I'm not sure where I would have come down in that case prior to

23   joining the firm.  Obviously that was different.  There was

24   pendency, and iHope, the attorney there wanted iBRAIN to be on

25   a substantially similar basis.  And the Second Department said,

1    no, you don't have any right to run from one school to another

2    and proclaim pendency simply because it's similar.  This is

3    different, Judge.  These cases, these students have pendency

4    orders for iBRAIN, and yet there's delay, there's these

5    requests for documentation, despite the fact that documentation

6    is provided.  I don't know if there is bad blood between——in my

7    personal opinion, it seems there is bad blood between the DOE

8    and the school.  And I'm not sure at this point which side

9    makes it worse.  I'm not sure if they're engaged in a death

10   battle and struggle between the two on a daily basis.  All I

11   can see is what's happening with these students.  And I know

12   the implication is I represent the school.  Honestly, I do not

13   represent their interests.  At certain times they're aligned,

14   they're the same.  The fact that they need to get paid to

15   educate my clients is important, but what I'm looking at,

16   Judge, is my students.  These students shouldn't have their

17   education interrupted, you know, if the DOE and the school

18   can't get along.  They need to figure this out.  Judge, was it

19   Broderick, I think recently ordered us to sit down with folks

20   from the DOE and iBRAIN and transportation to try to hash out

21   what's going on here.  Some parts of the meet-and-confer were

22   helpful, some not so much.  But as I said, they're not at play

23   here.  I am open to anything I can do in any case going forward

24   to avoid coming here and litigating.  Whether the law

25   department wants to have the particular individual, wants to

NCJ1GRUA

1    meet with other parents, not just me, other clients, other

2    attorneys, anything I can do, Judge.  But to answer your

3    original question, seems that there is some residual

4    consternation, for lack of a better word, between iBRAIN and

5    the DOE, and these kids are getting caught up in the middle of

6    that.  And whenever a lawsuit is brought by me, there is some

7    looking backwards to other lawyers who were at the school at

8    some point in time and is this litigation similar.  These are,

9    as I look at them, completely different litigations, Judge.

10   *[Unintelligible]*

11             THE COURT:  I'm not hearing the last thing you said.

12             MR. BELLANTONI:  I'm just trying to differentiate

13   *Ventura* and the first flood of cases from what's happening

14   here, Judge.

15             THE COURT:  Okay.  Thank you.

16             Mr. Lindeman, you also I believe have been witness to

17   history here.  Do you wish to speak to these issues?  Because I

18   don't think it's good for any of us involved in this litigation

19   to be involved in a series of preliminary injunctions and

20   temporary restraining orders based on pendency or based on

21   payments.  So what is the problem between your client and

22   iBRAIN that these payments are not going through?  Because

23   ultimately, in the letter I received from Mr. Vyas today, they

24   were due.

25             MR. LINDEMAN:  Your Honor, I can't speak to any bad

NCJ1GRUA

blood.  I don't necessarily know that——certainly I don't think
the DOE appreciates being sued regularly, but I don't——but no
one is trying to prevent these students from receiving services
or put the school out of business, as I think I was accused of
a few weeks ago by Mr. Mielnik, or any number of other issues.
The reality is I just don't think——like, while I'm sure that
outside of the city the Brain Injury Rights Group does
represent other students at other schools, I'm not aware of any
lawsuits that they've brought on behalf of any other——or any
students attending any other school in the city, or in the
Southern District or the Eastern District, and I don't know of
any firm that is bringing these types of motions in that——in
this way.  Certainly, you know, the Cuddy Law Firm does not
bring motions in this way; Elisa Hyman's law offices; Gary
Mayerson.  We obviously have a lot of——there's a strong parents
bar, and in many ways that is good.  They function as a private
attorney general in the way they are supposed to.  But no one
else is bringing preliminary injunction motions and TROs and
consistent repeated cases, bringing cases in the summer seeking
a pendency order, and bringing cases in the fall seeking a
pendency payment.  And in the next 30 minutes or so I'll be
traveling to Brooklyn to meet Mr. Bellantoni, which is why I
believe he was driving in his car while reading our letter, so
we can do this all over again, and I just don't know that we're
necessarily accomplishing all that much by doing that.  But

NCJ1GRUA

1    that's how it's been the last year or two.

2                THE COURT:  All right.  Thank you.  I've heard enough.

3    Thank you all very much.

4                I am denying the TRO because based on the record

5    before me, I don't think there's a basis for me to grant the

6    TRO either under *Mendez* or under the traditional factors for

7    determining or giving preliminary injunction.  And in

8    particular, that's because, with respect to the tuition, the

9    letter that I received from Mr. Vyas today indicates to me that

10   tuition payments are being processed, they're being put even on

11   a priority track, and that they're going to be paid soon, and

12   that really is the issue that was presented to me in the

13   complaint.

14               I want to pause for a moment here and say that I'm not

15   actually sure I agree with the underlying concept of

16   plaintiff's litigation, which is that if the school starts

17   feeling financial pressures and has difficulty making payroll,

18   that somehow that allows for injunctive relief.  I'm worried

19   about where that actually leads to logically, because if for

20   whatever reason iBRAIN is not financially stable, either

21   because it's a relatively new school or because its finances

22   aren't well administered or any other reason, I'm not sure that

23   that fact——its financial instability——should somehow cause its

24   students to be treated differently or with greater priority

25   than anybody else.

NCJ1GRUA

1          But putting that to the side for the moment, the issue

2    for me is that there are four students who are before me.  It

3    appears that the tuition payments are not disputed; it appears

4    that either they've been paid, they've mostly been paid, or

5    they're on their way to being paid, and they're going to be

6    placed on a priority basis.

7          With respect to the issue of the nursing and the

8    transportation services, I have the same concerns about the

9    letters, those supporting letters from B&H that Mr. Lindeman

10   has, which is they're form letters for which I really don't

11   have any substantiation and the student's name is different and

12   the addressee's name in one case is different.  So maybe they

13   are legitimate, maybe they're correct, but I'm not willing to

14   put a TRO in place for that reason.

15         And with respect to the transportation, again, I don't

16   have any indication that one of these four students was going

17   to lose their transportation, or indeed that they're going to

18   actually lose their nursing services, enough that I'm going to

19   impose a TRO.

20         So for those reasons I'm denying a TRO in this case.

21   But that, of course, is not the end of the issue because there

22   is as well a request for a preliminary injunction.  And I guess

23   what I'd like to do is, just as Mr. Lindeman, and perhaps even

24   Mr. Bellantoni, have no great desire to be meeting with a

25   different judge every single day to try and figure out what the

NCJ1GRUA

1    underlying problem is between iBRAIN and DOE, I am not looking

2    forward to redoing this in about two weeks, but it seems that

3    that's where we are, because there is a request for a

4    preliminary injunction, and I set something if only so that

5    then Mr. Vyas will tell me how much closer we are to these

6    folks getting paid.

7            So Mr. Bellantoni, is it still your wish, sir, to

8    pursue a preliminary injunction in this case?

9            MR. BELLANTONI:  Not——yes, your Honor.

10           THE COURT:  All right.  My recollection is that for

11   the *Rodriguez* case, that's on the calendar for January 5th, but

12   let me please look at my calendar, which I'm trying to do as I

13   talk to you.

14           I do.  I have it for 10:30 a.m.  Am I right?  Do I

15   have that correct, Mr. Bellantoni, Friday, the 5th, at 10:30?

16           MR. BELLANTONI:  Yes, Judge.

17           THE COURT:  Okay.  Then I'll be putting this on for

18   January 5th, at 10:30 as well, and we'll see where we are at

19   that point, on January 5th.

20           Friends, I know you have other judges to go see.

21   Mr. Vyas, I'm going to ask you to order, please, a transcript

22   of this conference in the ordinary course.

23           I'll let you all go.  Thank you very much.  Happy

24   holidays to you all.  We're adjourned.

25           ALL COUNSEL:  Thank you, your Honor.
                              o0o